## INFORMATION PROVIDERS' COALITION FOR DEFENSE OF THE FIRST AMENDMENT, Petitioner,

**Ameritech Operating Companies, (Illinois Bell Telephone Co., Indiana Bell Telephone Co. Incorp., Michigan Bell Telephone Co., Ohio Bell Telephone Co., Wisconsin Bell, Inc.), Intervenor,**

v.

## FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

**GTE Service Corporation and its Affiliated Domestic Telephone Operating Companies ("GTOCS"), Southwestern Bell Telephone Company, Respondent–Intervenor.**

No. 90–70379.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1990.

Decided March 21, 1991.

Earl Nicholas Selby, Palo Alto, Cal., for petitioner (argued).

William Bennett Turner, Beth S. Brinkmann, Turner & Brorby, San Francisco, Cal., for petitioner.

Robert L. Pettit, John E. Ingle, Jane E. Mago (argued), Laurence N. Bourne, F.C.C., Washington, D.C., for FCC, respondent.

Barbara L. Herwig, Lowell V. Sturgill, Jr., U.S. Dept. of Justice, Washington, D.C., for respondent.

Clarine Nardi Riddle, Atty. Gen., Rachel O. Davis, Asst. Atty. Gen., State of Conn., New Britain, Conn., for amicus curiae.

Before ALDISERT,* KOZINSKI and NELSON, Circuit Judges.

ALDISERT, Circuit Judge:

In this petition for review of a *Report and Order* of the Federal Communications Commission ("Commission" or "FCC"), we revisit continued Congressional efforts to prevent minors from using telephone lines to gain access to "dial-a-porn" programs. The petitioner has challenged the 1989 amendment to the Communications Act, known as the Helms Amendment, 47 U.S.C. §§ 223(b), *et seq.*, and the FCC's *Report and Order* and the regulations promulgated thereunder, 47 C.F.R. § 64.201 (1990), as violative of the first and fifth amendments to the United States Constitution.

The 1989 Congressional action responded to the decision in *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), which held a prior version of the Act unconstitutionally overbroad. Other questions are presented, but the major issue for decision is whether reverse blocking of telephone access meets the Court's requirement of a "carefully tailored" or "narrowly tailored effort to serve the compelling interest of preventing

* Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

minors from being exposed to indecent telephone messages." *Sable,* 492 U.S. at 126, 131, 109 S.Ct. at 2836, 2839. The petitioners contend that only central office, or voluntary, blocking of telephone service meets the Court's requirement. Generally speaking, in reverse blocking, telephone access is provided to only those who request the service; in central blocking, access is provided to all except those who request no access. To borrow class action parlance, in reverse blocking a subscriber "opts in" to obtain the service; in central office blocking, the subscriber "opts out" to refuse it.

Dial-a-porn is a widely understood shorthand expression to describe a telephone "information service" that offers sexually-oriented messages, recorded or live, to callers for a fee. Providers of this service subscribe to special mass announcement lines offered by telephone companies that are designed to handle large volumes of calls simultaneously. Typically, the message provider establishes the fee on a per-call basis. The telephone company may collect the fee as part of a billing arrangement or the provider may collect it by credit card or by establishing an individual account to be paid by check or money order. Telephone numbers for dial-a-porn services readily are available to both adults and children; they are published in a variety of different magazines, left in fliers on cars and advertised in the yellow pages of telephone books.

The petitioner, Information Providers' Coalition for Defense of the First Amendment, an unincorporated ad hoc association, consists of a large number and broad range of individuals and companies, including dial-a-porn operators, equipment providers, listeners and others. Intervenors Ameritech Operating Companies, GTE Service Corporation and Southwestern Bell Telephone Company, regional Bell operating companies, are subject to section 223 and the FCC regulations.

The Coalition has mounted an assault on section 223 of the Act and the FCC's implementing regulations. It argues that the statute and regulations violate the first amendment because they do not utilize the least restrictive means for limiting minors' access to dial-a-porn programs, and that they violate the first and fifth amendments because they authorize a prior restraint on speech and take property without adequate procedural due process. The Coalition also argues that the FCC acted in an arbitrary manner and abused its discretion in determining "safe harbors," the allowable defenses to criminal prosecution. We must decide also whether the FCC's definition of "indecent" is unconstitutionally vague. The Commission has defined "indecency" as "the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the telephone medium." *Report and Order,* ¶ 12 (Excerpts, p. 6).

I.

We have jurisdiction to review the Commission's final rulemaking orders pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1), which grants the court of appeals exclusive jurisdiction "to enjoin … or to determine the validity of" final regulations promulgated by the FCC. Although a reviewing court should not ignore Congress' conclusion about an issue of constitutional law, it is the ultimate responsibility of the courts to decide whether Congress has violated the Constitution. *Sable,* 492 U.S. at 129, 109 S.Ct. at 2838. This is particularly true where the legislature has concluded that its product does not violate the first amendment. *Id.* " 'Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake.' " *Id.* (quoting *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978)). Agency actions are reviewed according to the deferential standard of review applicable to agency rulemaking under the Administrative Procedure Act ("APA"). Under this standard, the petitioner must show that the Commission's rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review of an agency fact-finding regularly proceeds under the rubric of "sub-

stantial evidence" set forth in section 706(2)(E) of the APA. This does not mean a large or considerable amount of evidence, but rather only " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Pierce v. Underwood*, 487 U.S. 552, 564–65, 108 S.Ct. 2541, 2549–50, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)).

## II.

The 1989 Amendment is Congress' third attempt to solve the perplexing problem of restricting minors' access to dial-a-porn programs while simultaneously preserving first amendment guarantees for adults who desire such services. Congress, the Commission and the federal judiciary have curtseyed and bowed through various statutory and regulatory scores, each in turn taking the lead. Until the Supreme Court's decision in *Sable*, most of the federal appellate court decisions emanated from the United States Court of Appeals for the Second Circuit. *See Carlin Communications, Inc. v. FCC*, 749 F.2d 113 (2d Cir.1984) (*Carlin I*); 787 F.2d 846 (2d Cir.1986) (*Carlin II*); and 837 F.2d 546, (2d Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988) (*Carlin III*). We need not describe here the points and counterpoints of the two previous acts of Congress, the implementing regulations of the FCC and the responses of the judiciary from 1983 to 1989. This account is minutely detailed in the *Carlin* cases.

It is sufficient only to relate that Congress enacted the first dial-a-porn legislation in 1983 and directed the FCC to promulgate rules setting forth methods by which dial-a-porn companies could demonstrate their intention to limit their messages to adults. The court of appeals overturned the FCC's time-channeling regulations in *Carlin I* and remanded the case several times throughout the pendency of the *Carlin* cases. Congress visited the problem again in April 1988 and attempted to prohibit indecent as well as obscene telephone communications directed at any per-

son regardless of age. The Supreme Court upheld the statutory prohibition against obscene telephone communications but ruled that merely indecent communications are entitled to some protection under the first amendment. In response to the Court's decision in *Sable*, Congress enacted in 1989 the precise statute now before us.

## III.

In addressing a challenge to the 1988 version of section 223(b), the Court in *Sable* upheld the statutory prohibition against obscene telephone messages, holding explicitly that "there is no constitutional stricture against Congress' prohibiting the interstate transmission of obscene commercial telephone recordings." 492 U.S. at 124, 109 S.Ct. at 2835. The Court rejected the apparent conclusion of *Carlin III* that the first amendment bars all regulation of indecent messages. It agreed that sexual expression that "is indecent but not obscene is protected by the First Amendment....", *id.* at 126, 109 S.Ct. at 2836, but that the government may regulate the content of constitutionally protected speech in order to promote a compelling interest: "It is not enough to show that the government's ends are compelling; the means must be carefully tailored to achieve those ends." *Id.* at 126, 109 S.Ct. at 2836. Congress and the Commission, therefore, may oversee indecent dial-a-porn industry messages through " 'narrowly drawn regulations designed to serve [the compelling interest of preventing minors from being exposed to indecent telephone messages] without unnecessarily interfering with First Amendment freedoms.' " *Id.* at 126, 109 S.Ct. at 2836 (citations omitted).

Congress' outright ban on indecent messages in 1988 did not pass constitutional muster because it limited "the content of adult telephone conversations to that which is suitable for children to hear." *Id.* at 131, 109 S.Ct. at 2839. At the same time the Court agreed with the Commission's conclusion that establishing credit card, access code and scrambling rules were "a satisfactory solution to the problem of keeping indecent dial-a-porn messages out

of the reach of minors." *Id.* at 128, 109 S.Ct. at 2837.

The assumption behind these rules was that credit cards, access codes and scrambling techniques were available only to those over 18 years of age and, therefore, served as a positive deterrent to dial-a-porn access by minors. The Court also endorsed the court of appeals' determination "that these rules represented 'a feasible and effective' way to serve the Government's compelling interest in protecting children." *Id.* at 128, 109 S.Ct. at 2837 (citing *Carlin III*, 837 F.2d at 555). The Court concluded that the government could not justify a ban on all indecent dial-a-porn messages when the record evidence disclosed the availability of technology that would permit full adult access to dial-a-porn messages while denying ingress to all but "the most enterprising and disobedient young people." *Id.* at 130, 109 S.Ct. at 2838.

## IV.

Congress quickly responded to the June 1989 *Sable* decision. In November 1989 it again amended section 223. Instead of banning indecent speech as it had done in the 1988 amendment, this time Congress regulated it. Section 223(b) now provides in relevant part:

(2) Whoever knowingly—

(A) within the United States, by means of telephone, makes (directly or by recording device) any indecent communication for commercial purposes which is available to any person under 18 years of age or to any other person without that person's consent, regardless of whether the maker of such communication placed the call; or

(B) permits any telephone facility under such person's control to be used for an activity prohibited by subparagraph (A), shall be fined not more than $50,000 or imprisoned not more than six months, or both.

(3) It is a defense to prosecution under paragraph (2) of this subsection that the defendant restrict access to the prohibited communication to persons under 18 years of age or older in ac-

cordance with subsection (c) of this section and with such procedures as the Commission may prescribe by regulation.

Section 223(c) describes how access to subscribers may be restricted:

(1) A common carrier within the District of Columbia or within any State, or in interstate or foreign commerce, shall not, to the extent technically feasible, provide access to a communication specified in subsection (b) of this section from the telephone of any subscriber who has not previously requested in writing the carrier to provide access to such communication if the carrier collects from subscribers an identifiable charge for such communication that the carrier remits, in whole or in part, to the provider of such communication.

The Commission also moved rapidly to implement the legislation. It fashioned a proposal and then solicited comments and asked interested parties to offer "alternatives, including technological advances and new telephone company service offerings with full discussion of the related costs and benefits...." *Notice,* 5 F.C.C. Rcd 1011 (1990) (Supp.Excerpts, p. 1). Under the proposal and legislative schema, a dial-a-porn provider would have certain defenses, known as "safe harbors," against any criminal prosecutions under section 223. The statutory "safe harbor" is the reverse blocking requirement set forth in section 223(c)(1). The regulatory "safe harbors" are those provided in the proposed amendment to the Code of Federal Regulations, 47 C.F.R. 64.201: The provider would have a defense if it (1) had notified the common carrier on whose network it offered its service that its material was sexually oriented, (2) had requested that the carrier specifically identify any calls to the dial-a-porn service on the subscriber's bill (if the provider offered its services on the generally available telephone lines) and (3) required those using the dial-a-porn service to pay by credit card, obtain an access code or use a descrambler. *Notice,* 5 F.C.C. Rcd at 1015 (Supplemental Excerpts, p. 5).

## V.

Responding to section 223(b)(3), which allowed it to promulgate regulations, the Commission initiated proceedings in February 1990 to determine what was "technically feasible" as contemplated by section 223(c). It bears emphasis that the thrust of the Commission's effort was to establish "safe harbors," or defenses to prosecutions. The Coalition's attack before us centers on the regulations that specifically provide these "safe harbors." These stated defenses are available under the legislative schema and the FCC implementing regulations to those who "restrict access to persons under 18 years of age." 47 U.S.C. § 223(b)(3).

It bears emphasis also that the "reverse blocking" attacked here is but one of several "safe harbors" and is triggered only when the dial-a-porn provider asks the telephone carrier to engage in billing and collection services. Thus, if the dial-a-porn provider bills the user of its services directly, no blocking of telephone service comes into play. See 47 U.S.C. § 223(c)(1).

In considering whether reverse blocking meets the strictures imposed by the Court in *Sable*, it is critical that the system not be considered *in vacuo*. Blocking is at the bottom of a series of multi-tiered "safe harbor" defenses. Thus, when inquiring whether reverse, as distinguished from central office, blocking qualifies as a "carefully" or "narrowly tailored effort" as required by *Sable*, or whether it constitutes prior restraint, we must not be distracted from the reality that no blocking whatsoever takes place where the dial-a-porn provider (1) bills directly the user of its services, and (2) accepts payment directly by a credit card or requires an access code or descrambler. We repeat again for emphasis that only when the provider and the telephone carrier arrange to add the charge to the telephone bill is blocking activated.

It is against this backdrop that we review the evidence presented to the Commission. We must decide whether substantial evidence supports the Commission's finding that reverse blocking was technically feasible. Separate from, but related to, this task is an inquiry whether substantial evidence supports the agency's finding that central office blocking was not effective. These queries as to the quantum of evidence are but preliminary steps to the overarching question of whether reverse blocking meets the first amendment requirement of being a "carefully tailored" or a "narrowly tailored effort" to serve the compelling interest of preventing minors' exposure to indecent telephone messages.

### A.

The Commission received comments from a variety of sources. Several commenters, including local telephone companies familiar with the state of telephone technology, advanced the view that the FCC proposal offered the least restrictive means of accomplishing the statute's goal. The Religious Alliance reemphasized the importance of restricting minors' access to dial-a-porn. It cited extensive evidence regarding the effects of pornography on children, noting that "over 70% of all dial-a-porn calls are made by children, most of them between the ages of 10 and 16." Comments of Religious Alliance, p. 17 (Supp. Excerpts, p. 40) (footnote omitted). Several state attorneys general similarly emphasized the importance of restricting minors' access to dial-a-porn services and expressed their support of the statute's reverse blocking requirement. A number of commenters urged the FCC to define indecency to facilitate enforcement of the statute and regulations.

### B.

■ For its part, the Coalition urged the Commission to adopt an additional alternative defense to prosecution under section 223 based on the availability of central office, or voluntary blocking. Observing that approximately 29 states offer some form of central office blocking, the Coalition specifically described the blocking options available to some telephone subscribers in New York and California and urged the Commission to conclude that dial-a-porn providers should not be prosecuted under section 223 if they operated in areas where

telephone subscribers may ask local carriers to block calls from their homes to the information services. Comments of Information Providers' Coalition, pp. 22–33 (Supp.Excerpts, pp. 411–22). Yet it conceded that its proposal had flaws. The Coalition admitted that the central office blocking option offered in California would not block calls from California minors to dial-a-porn services in other states. *Id.* at 24–25 n. 8 (Supp.Excerpts, pp. 413–14 n. 8). It sought to minimize that flaw by suggesting that such services were not available in other states except New York, where adult services had been placed on an exchange that could not be accessed by out-of-state callers. *Id.* It later conceded, however, that adult programming also was available in Texas. *Id.* at 28 n. 12 (Supp. Excerpts, p. 417 n. 12), and suggested that the Commission could ignore the Texas problem because the Coalition doubted "that more than a handful of such calls are actually completed." *Id.*

Other commenters challenged the effectiveness of the Coalition's proposal. The Religious Alliance presented evidence that central office blocking would not prevent harm to children. Southwestern Bell Telephone Company explained that central office blocking was not effective in preventing access by minors, explaining that blocking within its service area was limited and would not impede long-distance calls to adult services. *See* Reply Comments of Southwestern Bell Telephone Company, p. 3 (Supp. Excerpts, p. 450) (filed March 13, 1990). The Ameritech Operating Companies disclosed that their own blocking capability was limited and would not prevent calls to other area codes. Reply Comments of Ameritech Operating Companies, pp. 3–4 (Supp. Excerpts, pp. 453–54) (filed March 13, 1990). BellSouth and Pacific Bell said that the Coalition's plan was not realistic because it depended upon an incorrect assumption that all adult services would be placed on a single local exchange. Reply Comments of BellSouth, p. 2 (Supp. Excerpts, p. 456) (filed March 13, 1990); Reply Comments of Pacific Bell and Nevada Bell, pp. 3–4 (Supp.Excerpts, pp. 460–61) (filed March 13, 1990).

This too must be said. A parent often does not request central office blocking until after the minor has consummated a call and the parent has discovered it on the telephone bill. Under such circumstances, the central office method, even where effective, does not completely bar or totally impede; from a practical standpoint, central blocking is invoked only after the minor's physical and psychological well-being have been damaged. Thus, the barn door is shut after the horse has gone.

### C.

On June 29, 1990, the FCC issued its *Report and Order* adopting regulations implementing section 223(b), including its proposed 47 C.F.R. 640.201. The *Report and Order* once again reviewed the legal history of dial-a-porn regulation and stated the Commission's understanding that it could regulate indecent calls if it adopted narrowly tailored means to promote a compelling interest. *Report and Order,* ¶ 14 (Excerpts, pp. 6–7) (citing *Sable,* 109 S.Ct. at 2836). The Commission concluded that blocking alone "would be insufficient to achieve realistically the goal of the statute: the protection of children." *Id.* ¶ 16 & n. 17 (Excerpts, pp. 7–8 & n. 17). Pointing to the evidence in the record, the Commission noted that existing blocking arrangements had not prevented children from obtaining dial-a-porn services by long-distance calls. *Id.* ¶ 16 (Excerpts, p. 8). Further, it said, blocking does not prevent access from unblocked phones. *Id.*

Yet it found that of the two types of blocking under consideration, the central office type was less effective. The Commission noted that only a small number of phones were likely to be blocked through the central office system, and that minors would continue to have substantial access to dial-a-porn services. *Id.* ¶¶ 18–21 (Excerpts, pp. 8–9). The Commission concluded that voluntary blocking would not be an effective means of limiting minors' access to dial-a-porn services.

We are satisfied that substantial evidence supports this finding and will not

disturb it on review. We are satisfied also that substantial evidence supports the Commission's finding that reverse blocking was "technically feasible." We turn now to the petitioner's attack on the Commission's definition of "indecency."

## VI.

■■■ The petitioner argues that the term "indecent" as used in section 223(b) and defined in the FCC's rules is unconstitutionally vague. As stated before, in the dial-a-porn context the Commission defined "indecent" as "the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary standards for the telephone medium." *Id.* ¶ 12 (Excerpts, p. 6). The Commission noted that, thus defined, the term was no more vague than the definition of obscenity applied in numerous Supreme Court cases, *see, e.g., United States v. 12 200–Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 130 n. 7, 93 S.Ct. 2665, 2670 n. 7, 37 L.Ed.2d 500 (1973); *Miller v. California,* 413 U.S. 15, 25, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), and that dial-a-porn providers would exercise the same kind of judgment with regard to indecency that they would make regarding obscenity. *Report and Order,* ¶ 13 (Excerpts, p. 6).

The constitutional proscription against vague laws is "a basic principle of due process." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). Within this doctrine is the idea that persons of ordinary intelligence should have a reasonable opportunity to know what is prohibited and that the standards should be clear enough to curb the danger of arbitrary or discriminatory enforcement. The requirement of clarity is enhanced when criminal sanctions are at issue or when the statute " 'abut[s] upon sensitive areas of basic First Amendment freedoms.' " *Id.* at 109, 92 S.Ct. at 2299 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964)). Nevertheless, even in the strictest sense, "due process does not require 'impossible standards' of clarity." *Kolender*

*v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983) (quoting *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947)). "[W]e can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 (footnote omitted).

The appellant in *Sable* made a similar challenge to the earlier version of section 223, which was neither more nor less precise than the current definition of "indecent." Brief for Respondents at 19 n. 13 (citing Brief for Appellant/Cross Appellee Sable Communications of California, Inc. at 32–37, *Sable,* 492 U.S. at 116, 109 S.Ct. at 2829). The Court gave the shortest shrift to the argument: It did not discuss it. The Court rapidly moved to the conclusion that the government may regulate constitutionally protected indecent speech if it employs narrowly tailored regulations designed to serve the interest of shielding minors from indecent telephone messages. At 126, 109 S.Ct. at 2836. By saying that it was not necessary "to decide what is obscene and what is indecent ...", *id.* at 124, 109 S.Ct. at 2835, the necessary implication of the Court's action is that the term "indecent" as interpreted by the Commission is not per se void for vagueness. We conclude that the term "indecent" as defined in the *Report and Order* is sufficiently precise to survive constitutional scrutiny.

### A.

The legislative history of section 223(b) and the FCC's interpretation of that provision in the *Report and Order* make it clear that the term "indecent" has a judicially recognized meaning that is not unconstitutionally vague. In framing its definition the Commission operated in a safe harbor of its own: It turned to the broadcast industry and borrowed a definition that already had received the imprimatur of the Court. The FCC lifted the definition of "indecent" from the broadcast regulatory setting, in which it had been designed to describe nonobscene communications that were found to be harmful to minors. *See FCC v. Pacifica Found.,* 438 U.S. 726,

731–32, 748–51, 98 S.Ct. 3026, 3031, 3040–41, 57 L.Ed.2d 1073 (1978); *see also Sable*, 492 U.S. at 126, 109 S.Ct. at 2836. In the broadcast context, both specific and generic applications of this standard have survived vagueness challenges. *See Pacifica*, 438 U.S. at 742–43, 98 S.Ct. at 3037 (upholding application of "indecency" standard to broadcast); *Action for Children's Television v. FCC*, 852 F.2d 1332, 1338–39 (D.C.Cir.1988) ("[I]f acceptance of the FCC's generic definition of 'indecent' as capable of surviving a vagueness challenge is not implicit in *Pacifica*, we have misunderstood Higher Authority and welcome correction.").

### B.

We perceive the Coalition's void-for-vagueness argument taking two discrete forms. One, in our view, is deliberately understated, if not actually unstated: This is the traditional argument that standards should be clear enough so that persons of ordinary intelligence have a reasonable opportunity to know what is prohibited and thus curb the danger of arbitrary or discriminatory enforcement. The Coalition does not dwell on this basic argument at length. And for very good reason. Neither the *Sable* nor the *Pacifica* Courts had trouble with this contention. If the indecency definition passes the void-for-vagueness test for persons of ordinary intelligence who broadcast radio communications, it certainly must pass the same test for those persons who offer indecent communications over the telephone line.

Moreover, for purposes of the vagueness argument, we may analogize the Commission's definition of indecency to what the Court has described as obscenity. The formulation of what is considered obscene set forth in *Miller v. California*, 413 U.S. at 25, 93 S.Ct. at 2615, and *United States v. 12 200–Ft. Reels of Super 8mm. Film*, 413 U.S. at 130 n. 7, 93 S.Ct. at 2670 n. 7, passed the void-for-vagueness test in *Hamling v. United States*, 418 U.S. 87, 110–116, 94 S.Ct. 2887, 2904–07, 41 L.Ed.2d 590 (1974). The Commission's definition here, obviously patterned after the examples suggested in *Miller*, passes constitutional muster for the same reasons set forth in those cases.

### C.

The Coalition's second argument is essentially an end run around the traditional contention and restates its carefully-or-narrowly-tailored argument in the raiment of a void-for-vagueness contention. There is a deliberate purpose or method to the petitioner's approach: It seeks somehow to find differences in the material facts that undergird *Pacifica* and this case. Thus, it suggests that the phrase "community standards for the telephone medium" is vague because no existing case law discusses this concept for the telephone medium. Brief for Petitioner at 35. It cites a number of cases, including *Sable*, that distinguish broadcast regulation from other settings in which first amendment concerns arise. *Id.* at 37–38. We note that the *Sable* opinion did not describe the Commission's definition of indecency in *ipsissimis verbis*. No question was presented there, and none here, of the contents of the Commission's definition discussed in *Pacifica*, 438 U.S. at 732, 739, 98 S.Ct. at 3031, 3035. To be sure, the Court in *Sable* noted that the *Pacifica* opinion detailed the "unique" attributes of broadcasting. 492 U.S. at 127, 109 S.Ct. at 2837. We also recognize that the Court went to great pains in *Sable* "to distinguish *Pacifica* from the case before us." *Id.*

### D.

We are constrained to analyze *Pacifica* in this discussion on vagueness in order to respond to the petitioner's tortuous attempt to prevent any reliance on the *Pacifica* Court's reference to indecent language. We question the relevance of this particular argument in the context of a void-for-vagueness contention, but for the sake of completeness we will meet the question head-on. For purposes of the Coalition's vagueness argument, we believe that the facts in the compared cases are distinctions without material differences. Although the *Pacifica* holding may not be

stretched too broadly, what was said there must not be construed too stringently. And that is precisely what the Coalition is doing here. We must examine what was actually said in that case and not what others now say was said. In the context of a vagueness inquiry, the clear words of *Pacifica* control, not interpretations of them.

Its discussion of the unique aspects of radio broadcasting merely fleshed out the major premise of the Court's inquiry:

In this case it is undisputed that the content of Pacifica's broadcast was "vulgar," "offensive," and "shocking." Because *content* of that character is not entitled to absolute constitutional protection under all circumstances, we must consider its *context* in order to determine whether the Commission's action was constitutionally permissible.

438 U.S. at 747–48, 98 S.Ct. at 3039 (emphasis added). The Court then said:

Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder. *Rowan v. Post Office Dept.*, 397 U.S. 728 [90 S.Ct. 1484, 25 L.Ed.2d 736 (1970)]. Because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content. . . .

Second, broadcasting is uniquely accessible to children, even those too young to read.

*Id.* at 748–49, 98 S.Ct. at 3040.

In comparing the total ban of indecent speech in *Sable* with the mere regulation of such speech in *Pacifica* (as is the case here), Justice White emphasized that *"Pacifica* is readily distinguishable from this case, most obviously because it did not involve a total ban on broadcasting indecent material." 492 U.S. at 127, 109 S.Ct. at 2837. Also emphasized was the recognition that "the government has a legitimate interest in protecting children from exposure to indecent dial-a-porn messages." *Id.* at 126, 109 S.Ct. at 2836.

The polestar that must guide us in this case, as in any first amendment speech case, is to evaluate both the content of words and the context in which they are delivered. In so doing, recourse to the metaphors used by the Court in *Pacifica* and later in *Sable* provide valuable insight into this task. In *Pacifica*, the Court borrowed the analogy of Justice Sutherland:

[A] "nuisance may be merely the right thing in the wrong place,—like a pig in the parlor instead of the barnyard." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 [47 S.Ct. 114, 118, 71 L.Ed. 303]. We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene.

438 U.S. at 750–51, 98 S.Ct. at 3040–41. In *Sable*, the Court admonished the Commission not " 'to burn the house to roast the pig.' " 492 U.S. at 127, 109 S.Ct. at 2836 (quoting *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957)).

We deem it significant that in *Sable* the Court had the opportunity to prohibit the broadcast definition of indecency for the telephone medium but deliberately chose not to do so. Instead, it instructed that indecent speech as so defined be regulated by a "narrowly tailored effort to serve the compelling interest of preventing minors from being exposed to indecent telephone messages." *Id.* 492 U.S. at 132, 109 S.Ct. at 2839.

In applying the content/context dichotomy, it is clear that under the statute and implementing regulations the content of indecent speech may be permissible in the adult parlor but not in the kid's room. By imposing reasonable and sensible optional "safe harbors," the FCC has not burned the house to roast the pig. Thus, whether construed from the traditional vagueness test, or by the petitioner's convoluted content/context-vagueness argument, the Commission's indecency definition passes constitutional muster against a void-for-vagueness attack.

## VII.

The petitioner next argues that section 223(c)(1) violates first amendment notions of prior restraint. As stated in Part IV, this section provides:

A common carrier within the District of Columbia or within any State, or in interstate or foreign commerce, shall not, to the extent technically feasible, provide access to a communication specified in subsection (b) of this section from the telephone of any subscriber who has not previously requested in writing the carrier to provide access to such communication if the carrier collects from subscribers an identifiable charge for such communication that the carrier remits, in whole or in part, to the provider of such communication.

We find no restraint of speech whatsoever.

■ The expression "prior restraint" in first amendment law is a term of art. In prior restraint cases, the government typically brings an action to enjoin speech or imposes a requirement of advance approval, censorship or licensing of speech. *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (action by United States to enjoin publication of classified material); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (injunction against distribution of literature); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (judicial order perpetually enjoining publication that was critical of government). None of this typical action is present here.

■ Carriers are private companies, not state actors. *See e.g., Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 358–59, 95 S.Ct. 449, 457, 42 L.Ed.2d 477 (1974), and accordingly are not obliged to continue, restrict or terminate the services of particular subscribers. Thus, a carrier is free under the Constitution to terminate service to dial-a-porn operators altogether. *See, e.g., Sable,* 492 U.S. at 131, 109 S.Ct. at 2840 (Scalia, J., concurring) ("[W]e do not hold that the Constitution requires public utilities to carry [dial-a-porn].''); *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291, 1297 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) (carrier is under no constitutional restraints in its policy of barring all "adult entertainment'' from its 976 network).

A telephone carrier therefore may ban "adult entertainment'' from its network and need not provide billing and collection services. Moreover, as we have observed repeatedly, if the billing and collection services are not provided by the carrier, reverse blocking is not triggered.

### A.

■ We do not dismiss the idea of "prior restraint'' without pause, but neither do we need to write a first amendment treatise simply because a petitioner injects these words into a case. To paraphrase Justice Holmes: "[An expression] is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.'' *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). Almost 34 years ago, Justice Frankfurter observed:

'The phrase' 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty learning to his support of constitutionally protected liberties: 'What is needed,' writes Professor Paul A. Freund, 'is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis.' The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 539.

*Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441–42, 77 S.Ct. 1325, 1328, 1 L.Ed.2d 1469 (1957).

For there to be *prior* restraint, there must first be *restraint.* To trigger opera-

tion of the doctrine, there must be some suppression, prohibition, inhibition, hindrance or constraint of speech by government action or rule. Here no restraint occurs. Receipt of uttered expression is provided immediately upon request. Speech is transmitted according to standard commercial practice: If a subscriber desires to receive dial-a-porn material, he or she requests it and pays for it.

The petitioner's primary prior restraint argument comes down to this: Central office or voluntary blocking does not offend this notion, but reverse blocking, or service upon request only, does. Thus, we must inquire whether when speech or publication is provided for a fee in the commercial arena, the act of requiring the user to make an advance request for access constitutes a prior restraint.

In so doing, we recognize that requesting access to dial-a-porn programs is conceptually no different from requesting access to a periodical by subscription, requesting admittance at a box office to an adult movie or requesting a copy of an adult magazine kept under the counter in a plain brown wrapper at the convenience store.

## B.

█ In view of the Supreme Court's decisions in *Sable* and *Pacifica*, we do not take too seriously the petitioner's secondary prior restraint argument. This seems to suggest that the "safe harbor" defense to a criminal prosecution which requires a provider to notify the telephone carrier that its material is sexually oriented is in and of itself a prior restraint because it requires the provider to take some affirmative step prior to expressing speech. The petitioner relies on *American Information Enterprises, Inc. v. Thornburgh*, 742 F.Supp. 1255 (S.D.N.Y.1990), and *Westpac Audiotext, Inc. v. Thornburgh*, No. C–90–0738 (FMS) 1990 WL 284518 (N.D.Cal. Aug. 15, 1990), for the proposition that requiring the provider to notify the carrier constitutes prior restraint.

This reasoning is based on false and mistaken assumptions. Its major premise assumes that the Supreme Court has not already clearly held that "the government has a legitimate interest in protecting children from exposure to indecent dial-a-porn messages" and that the government may regulate "[s]exual expression which is indecent but not obscene ... in order to promote a compelling interest if [the government] chooses the least restrictive means to further the articulated interest." *Sable*, 492 U.S. at 126, 109 S.Ct. at 2836. The government's authority to regulate the context of telephonic indecent speech is no longer an open question. The government clearly has this power.

From this it inexorably follows that for some regulation of indecent speech to occur, the speech first must be identified as indecent. The sole issue that remains in the development of first amendment law on this subject is the quantum of the restriction that regulates indecent speech. It is quantification of the restrictive means, not identification of the particular species of speech, that must command the inquiry of a reviewing court. All aspects preliminary to, or subsumed in, this inquiry must be deemed settled law and no longer subject to re-examination by a court of appeals or a district court. The Supreme Court has spoken.

Moreover, sound reasons support the Court's decisions. The district court cases relied upon by the petitioner in support of its prior restraint argument fail to recognize that labeling matter as indecent under the statute or regulation does not inhibit its dissemination one iota. Any adult who requests access to decent or indecent speech will get it, providing, of course, that he or she pays for it; pays for it the same way a person does when he or she buys a book, sees a movie, attends a concert, rents a videotape or buys a newspaper. First amendment freedom does not mean that materials or expressions must be provided free of charge or without request.

Similarly, we may analogize to the private sector. No prior restraint occurs in the motion picture industry when the studios, distributors or exhibitors label a motion picture as PG ("Parental Guidance Suggested. Some Material May Not Be Suit-

able For Children"); PG–13 ("Parents Strongly Cautioned. Some Material May be Inappropriate for Children Under 13"); R ("Restricted. Under 17 Requires Accompanying Parent or Adult Guardian"); and NC–17 ("Under 17 Not Admitted"). Any adult is free to attend any of these showings, because no legitimate industry interest exists in protecting adults from exposure to indecent speech.

## VIII.

██ Having determined that section 223 and the FCC rules pass constitutional scrutiny, we must turn to the final question of testing the FCC's action in promulgating the safe harbor rules under 223(b) against the standard of review applicable to agency rulemaking under the Administrative Procedure Act. The petitioner argues that the Commission's rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We believe that this argument mainly repeats, under a different vesture, the previous attacks on the FCC's rejecting central office blocking and adopting reverse blocking. To the extent this contention addresses other facets of the Commission's action we are satisfied, given the limited scope of review of the facts and legal precepts, that the agency action should not be disturbed. Only brief additional comments are necessary.

The petitioner contends that the scrambling option, provided as part of the safe harbor defense, is neither commercially available nor likely to become so. Brief for Petitioner at 45. However, the Court of Appeals for the Second Circuit approved the scrambling option in *Carlin III* in 1988. The court found that the record supported "the FCC's conclusion that a scheme involving access codes, scrambling, and credit card payment [was] feasible and effective." 837 F.2d at 555. It also concluded that the FCC had "provided a reasonable analysis explaining its decision to add scrambling as an optional defense." *Id.* at 556.

██ In this fourth attempt in seven years to adopt dial-a-porn regulations, the FCC was not required to discard or ignore record evidence it had developed in prior proceedings. In the absence of compelling contrary evidence, it was reasonable for the agency to give weight to its earlier adoption of scrambling and the judicial endorsement of that approach in *Carlin III*. The FCC did precisely this. It concluded that scrambling is feasible in the current state of technology and that, given a market, scrambling could become a viable option. *Report and Order*, ¶ 29 (Excerpts, pp. 12–13).

From the evidence in the record, the FCC considered different alternatives, provided for public comment and took the comments into account when it developed its rules. We conclude that substantial evidence in the record supports the FCC's findings and that in promulgating the rules, the Commission's action comported with the precepts that govern our review under the Administrative Procedure Act.

## IX.

We have considered all other contentions presented by the petitioner, including its procedural due process and takings claims, and conclude that they merit no additional discussion. We hold that the term "indecent" as used in section 223 of the Act and defined in the FCC rules is not void for vagueness, that the statute and the FCC's implementing regulations are narrowly tailored to promote the compelling government interest of protecting the physical and psychological well-being of minors, that section 223 is not a prior restraint on speech, that substantial evidence supports the agency findings and that the FCC did not act arbitrarily or capriciously, abuse its discretion, or act otherwise not in accordance with the law in promulgating its rules.

The petition for review is

DENIED.