**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHNNIE FUSON,

        *Plaintiff-Appellant*,

  v.

OFFICE OF NAVAJO AND HOPI
INDIAN RELOCATION, an
Administrative Agency of the United
States,

        *Defendant-Appellee*.

No. 23-15747

D.C. No. 3:21-cv-
08237-DJH

OPINION

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted April 8, 2024
Phoenix, Arizona

Filed April 16, 2025

Before: Michael Daly Hawkins, Bridget S. Bade, and
Roopali H. Desai, Circuit Judges.

Opinion by Judge Desai;
Dissent by Judge Bade

# SUMMARY[*]

## Navajo-Hopi Settlement Act

The panel reversed the district court's decision upholding the denial of Johnnie Fuson's application for relocation assistance benefits under the Navajo-Hopi Settlement Act.

Fuson, a registered member of the Navajo Tribe, was forced to relocate from his family's home following the partition of the Joint Use Area. The Office of Navajo and Hopi Indian Relocation denied his initial application, and on appeal the Independent Hearing Office ("IHO") deemed Fuson ineligible for benefits.

The panel held that the IHO's adverse credibility findings were not supported by substantial evidence. Generally, the IHO found every witness not credible because, according to the IHO, they were inconsistent with the other witnesses, who the IHO also deemed not credible. This circular reasoning created a catch-22 that guaranteed an adverse credibility finding as to every witness. Reviewing the individual credibility findings, the panel held that substantial evidence did not support the IHO's adverse credibility findings as to Johnnie Fuson, Johnnie's brother Benny Fuson, and his cousin Margery Greyhair.

The panel held that the IHO's finding that Johnnie was not a resident of the Hopi Partitioned Lands ("HPL")

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

homesite was arbitrary and capricious. The IHO erred in relying almost exclusively on the Bureau of Indian Affairs enumeration roster to conclude that Johnnie was a resident of the Navajo Partitioned Lands or Seba Dalkai, rather than the HPL. The IHO did not take into account, or otherwise address, the enumerator's contrary testimony about the roster's reliability. The panel remanded for further proceedings.

Dissenting, Judge Bade disagreed with the majority's conclusion that the IHO's adverse credibility determination with respect to Johnnie Fuson was not supported by substantial evidence. Even if all the testimony were deemed credible, that does not undermine the IHO's residency determination such that it is not supported by substantial evidence. Because the evidence relevant to Johnnie's eligibility for relocation benefits was, at best, ambiguous and inconclusive, the court must defer to the agency's findings and conclusions.

## COUNSEL

S. Barry Paisner (argued), Hinkle Shanor LLP, Santa Fe, New Mexico; Susan I. Eastman, Navajo-Hopi Legal Services Program, Tuba City, Arizona; for Plaintiff-Appellant.

Katelin Shugart-Schmidt (argued) and John E. Arbab, Attorneys, Environment & Natural Resources Division, Appellate Section; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Katherine R. Branch and William Staes, Assistant United States Attorneys, Office of the United States Attorney, United States Department of Justice, Phoenix, Arizona;

Larry Ruzow, Attorney, Office of Navajo and Hopi Indian Relocation, Flagstaff, Arizona; for Defendant-Appellee.

## OPINION

DESAI, Circuit Judge:

Nearly forty years after Johnnie Fuson, a registered member of the Navajo tribe, was forced to relocate from his family's home following the partition of the Joint Use Area ("JUA"), he was finally provided the opportunity to apply for relocation assistance benefits. The Office of Navajo and Hopi Indian Relocation ("ONHIR") denied his initial application and Johnnie appealed the decision to the Independent Hearing Officer ("IHO"). On appeal, Johnnie presented witnesses and evidence to piece together his family's history to prove eligibility for benefits. Without providing sufficient reasoning or considering material evidence in his decision, the IHO deemed Johnnie ineligible for benefits. We hold that the IHO's adverse credibility findings are not supported by substantial evidence and that his residency finding is arbitrary and capricious. We thus reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I. Relocation benefits became available as part of the Settlement Act.

In 1882, the President of the United States executed an executive order establishing a reservation in northeastern Arizona for the Hopi tribe and other tribes that the Secretary of the Interior decided to settle on those lands. *Sekaquaptewa*

*v. MacDonald*, 626 F.2d 113, 114 (9th Cir. 1980). As a result, members of the Navajo tribe settled in this area alongside members of the Hopi tribe. After co-existing on the reservation for seventy-five years, a dispute arose between the Hopi and Navajo tribes over who had ownership of the land. *Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1121 (9th Cir. 1989). The Arizona district court tried to resolve the dispute by determining that the tribes held joint, undivided, and equal interest in five-sixths of the reservation, referred to as the JUA. *Healing v. Jones*, 210 F. Supp 125, 132 (D. Ariz. 1962), *aff'd per curiam* 373 U.S. 758 (1963). But conflict persisted, and Congress eventually enacted the Navajo-Hopi Settlement Act ("Settlement Act") to partition the JUA between the Navajo and Hopi tribes. *Bedoni*, 878 F.2d at 1121. Pursuant to the Settlement Act, the Arizona district court delineated the Hopi Partitioned Lands ("HPL") and the Navajo Partitioned Lands ("NPL"). *Id.* This court approved the partition in *Sekaquaptewa*, 626 F.2d 113, and individuals residing on land partitioned to the tribe they were not a member of were required to relocate from their homes. *See* 25 U.S.C. § 640d-13(a) (1988) ("Consistent with section 640d-7 . . . or 640d-3 of this title, the Commissioner is authorized and directed to relocate . . . all households and members thereof and their personal property . . . from any lands partitioned to the tribe of which they are not members.").

As part of the relocation process, the Settlement Act allocated funds to provide eligible tribal members with benefits for relocating and to create ONHIR, a federal agency, to administer the Settlement Act. *See* 25 C.F.R. § 700.138. To qualify for benefits, an applicant had to show that (1) he was a resident of the land partitioned to the tribe

he was not a member of on December 22, 1974; and (2) he was head of household as of the date he moved away from the land partitioned to the other tribe. *Id.* §§ 700.147(a)–(b), 700.69(c).

## II. Johnnie and his family were longtime residents of the JUA.

Johnnie was born in 1944 and raised by his grandmother, Fannie Greyhair. His grandmother owned two homesites within the JUA, and their family grazed their livestock seasonally between the two homesites. In the early 1970s, Johnnie and his family spent much of their time at the homesite called Lukai Springs and considered it their primary residence.

In 1971, Johnnie married Ruth Begay. Johnnie did not consistently co-habitate with Ruth, who lived and worked at Seba Dalkai School[1] ("Seba Dalkai"), and the couple separated a few years later. The couple had four children together between 1972 and 1976 and officially divorced in 1978. Johnnie also worked during this time, but there is conflicting testimony as to the nature of his work.

After the JUA was partitioned on December 22, 1974, one of the family's homesites became part of the NPL, and Lukai Springs became part of the HPL. Pursuant to the Settlement Act, Lukai Springs now belonged to the Hopi tribe, and Johnnie's family was required to relocate. Around this time, the Bureau of Indian Affairs ("BIA") conducted a survey of Navajo and Hopi residents in the JUA. *Bahe v. ONHIR*, No. 17-08016, 2017 WL 6618872, at \*4 n.1 (D. Ariz. Dec. 28, 2017). After taking aerial photos of the JUA to identify the locations of structures, the BIA traveled to

---

[1] Seba Dalkai is located outside of the HPL.

each structure to interview the residents and compiled the information into the BIA enumeration roster. *Id.* According to the BIA enumeration roster, Fannie Greyhair was interviewed at both of her homesites. In January 1975, she was interviewed at her NPL homesite. Fannie is listed as head of household and Johnnie as one of the family members.[2] In January 1975 and April 1975, Fannie was interviewed at the HPL homesite. Fannie is listed as the head of household, and no other family members are listed.

As part of their relocation process, Johnnie's family also began selling their livestock through the government's livestock reduction program. Sometime after April 1974, the family finished selling all their livestock and moved away from Lukai Springs.

## III.  Johnnie applied for relocation benefits and appealed the denial of his application.

Based on his residence at his grandmother's HPL homesite, Johnnie applied for relocation benefits in 2010. ONHIR denied his application, and Johnnie appealed the decision. In support of his appeal, Johnnie testified and presented his cousin, Margery Greyhair, and his brother, Benny Fuson, as witnesses. He also provided transcripts of a former BIA enumerator's deposition and his ex-wife's testimony at her relocation benefits hearing.[3] In her deposition testimony, the former BIA enumerator explained the BIA's surveying process. When asked how BIA

---

[2] The parties stipulate that Johnnie established head of household status for purposes of his relocation benefits application.

[3] Johnnie's ex-wife, Ruth Begay, was granted relocation benefits based on her family's HPL residence, and the parties stipulate that Johnnie's claim is based only on Fannie's homesites.

enumerators addressed the ownership of multiple homesites, she explained that survey participants were asked to select a primary homesite, which would list all the owner's family members. Then, to avoid overcounting the total number of people in the JUA, only the owner would be listed at the secondary homesite. This was the case even if the family members spent equal amounts of time at each homesite. In other words, the roster did not always accurately report where a family spent their time.

The IHO denied Johnnie's appeal. The IHO first found that Johnnie, Benny, and Margery were not credible witnesses. In part, the IHO's adverse credibility findings were based on the inconsistency between the witnesses' testimonies, despite finding each witness not credible. He further found Margery's testimony "highly suspect" due to the passage of time. Then, the IHO concluded that Johnnie was not entitled to relocation benefits because there was no credible evidence in the record to find that Johnnie was a legal resident of Fannie's HPL homesite on December 22, 1974. Instead, the IHO concluded that Johnnie was a legal resident of the NPL homesite or Seba Dalkai. According to the IHO, the presence of Johnnie's family members at Seba Dalkai was an "overpowering determinant," as well as the fact that the BIA enumeration roster identified Johnnie at the NPL homesite. But the IHO failed to discuss testimony from Johnnie's ex-wife and the BIA enumerator that cut against his conclusion.

Johnnie filed an appeal in the district court challenging the denial of benefits under 25 C.F.R. § 700.147. Both parties filed motions for summary judgment. The district court affirmed ONHIR's denial of benefits, denied Johnnie's motion for summary judgment, and granted ONHIR's cross-motion for summary judgment. It found that substantial

evidence supported the IHO's adverse credibility findings, and that the IHO's decision was not arbitrary and capricious based on his use of the BIA enumeration evidence and failure to apply the customary use area policy.

## STANDARD OF REVIEW

We review a district court's decision to grant summary judgment de novo. *Bedoni*, 878 F.2d at 1122. Under the Administrative Procedure Act, we must determine if ONHIR's decision was "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Id.* (citing 5 U.S.C. § 706(2)(A), 2(E)).

## ANALYSIS

## I. The IHO's credibility findings are not supported by substantial evidence.

Our review of the IHO's credibility findings is deferential but not toothless. The IHO's credibility findings are granted deference because it is "in a position to observe [a witness]'s tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." *Sarvia-Quintanilla v. I.N.S.*, 767 F.2d 1387, 1395 (9th Cir. 1985). But deference does not absolve the IHO from his responsibility to provide sufficient reasoning for his decision, particularly where the IHO claims he has grounds for disbelieving material testimony. *See Ceguerra v. Sec'y of Health & Hum. Servs.*, 933 F.2d 735, 740 (9th Cir. 1991). Thus, when an IHO's decision "rests on a negative credibility evaluation," he "must make findings on the record *and must support those findings by pointing to substantial evidence* on the record." *Id.* at 738 (emphasis

added). Substantial evidence exists when there is "more than a mere scintilla" of relevant evidence such that a "reasonable mind might accept [it] as adequate to support a conclusion." *Biestek v. Berryhill,* 587 U.S. 97, 97 (2019) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Before assessing the individual credibility findings, we first address a troublesome aspect of the IHO's analysis overall. The IHO found every witness not credible because, according to the IHO, they were inconsistent with the other witnesses, who the IHO also deemed not credible. In other words, the IHO concluded that a witness was not credible by comparing that witness's testimony to another witness's testimony, but then also found the comparator witness's testimony not credible because it was inconsistent with the first witness's testimony. This circular reasoning created a catch-22 that guaranteed an adverse credibility finding as to every witness. Indeed, while the IHO apparently found each witness credible enough to discredit another witness, he declined to use their testimonies to support Johnnie's eligibility claims. We generally disagree with the IHO's flawed approach, but nevertheless review each credibility finding separately.

First, the IHO concluded in a single sentence that "Benny Fuson's testimony is confusing, conflicting and inconsistent with other witnesses and his testimony is not credible." But the IHO does not point to any inconsistency in the record or otherwise explain how Benny's testimony is confusing. Furthermore, the IHO's rationale relies on Benny's inconsistency with the other not credible witnesses. Thus, substantial evidence does not support the IHO's adverse credibility finding as to Benny.

Second, the IHO concluded that Margery was not credible because (1) her testimony was confusing and inconsistent with Johnnie and Benny's testimonies and (2) "her 40-year-old recollections as an 11-year-old child are highly suspect." Again, the IHO does not identify any specific inconsistency. Nor does he point to other evidence to explain how Margery's testimony was confusing. And by relying on comparisons to Johnnie and Benny's testimonies, the IHO's reasoning here suffers from the same circular and flawed logic explained above. Similarly, the IHO's perfunctory conclusion that Margery's young age at the time of the events and the subsequent passage of time rendered her recollections "highly suspect" also lacks support in the record.[4] The IHO's adverse credibility finding as to Margery is thus also unsupported by substantial evidence.

Third, the IHO found Johnnie not credible for several reasons. The IHO discounted Johnnie's testimony about residing on the HPL because of his family's residence at Seba Dalkai and his identification by the BIA as living on the NPL. But despite his family's residence at Seba Dalkai, Johnnie and his ex-wife both testified that he did not consistently live at Seba Dalkai. In addition, the BIA enumerator's testimony explained that being listed at one homesite on the enumeration roster was not necessarily indicative of a person's residence. Taking this testimony into account, the enumeration roster cannot negate Johnnie's testimony about residing on the HPL. Thus, the IHO's

---

[4] And because the relocation benefits eligibility criteria require applicants to recount events from decades ago, if the passage of time was a legitimate basis for adverse credibility, every witness who testifies in support of an applicant would be not credible. This cannot be the case.

decision to discredit Johnnie's testimony is unsupported by substantial evidence.

The IHO also found Johnnie not credible because, according to the IHO, Johnnie "downplayed his residence at Seba Dalkai" because his ex-wife became pregnant in 1971, 1973, 1975, and 1976.[5] In other words, the IHO did not believe Johnnie's testimony that he only resided at Seba Dalkai "on and off" during the relevant time period, because he had four children with his ex-wife during that time. But the record does not support the IHO's conclusion. Not only did Johnnie testify that he lived at Seba Dalkai "on and off," but the record also includes his ex-wife's testimony at her benefits hearing that Johnnie did not stay at Seba Dalkai regularly. Johnnie's ex-wife's testimony bolsters rather than undermines his credibility. Regardless, the IHO's reasoning is deeply flawed because it is based on the erroneous assumption that Johnnie must have continuously co-habitated with his ex-wife to have four children over the course of five years. The IHO does not provide any other basis to find that Johnnie downplayed his residence at Seba Dalkai. Thus, this basis for discrediting Johnnie is erroneous.

Then, the IHO concluded that Johnnie was not credible because he had a "distorted view about the Act's requirements for legal residence." The IHO does not point to any part of Johnnie's testimony to support this observation, nor are we able to find any. Moreover, even if there was evidence showing Johnnie misunderstood the Act's requirements, there is no rational connection between an applicant's failure to understand a statute and his ability to

---

[5] The children were born in 1972, 1974, 1975, and 1976.

testify truthfully. The IHO erred by discounting Johnnie's credibility on this basis.

The last reason the IHO provided for finding Johnnie not credible was his inconsistency with the other witnesses. In support of this position, the IHO pointed to two specific examples: (1) that Johnnie identified the structures at the HPL homesite differently than Margery; and (2) that Johnnie's testimony about his employment differed from Margery's recollection. But the IHO also found Margery not credible. It is thus difficult to understand how and why Johnnie's inconsistent testimony with Margery, a witness found to be not credible, could lead the IHO to conclude that Johnnie was also not credible. Indeed, the IHO's circular logic raises serious questions about whether a "reasonable mind might accept [this ground] as adequate to support" the IHO's adverse credibility finding. *Biestek*, 587 U.S. at 97. We thus cannot defer to the IHO's finding.

In conclusion, we reverse the IHO's adverse credibility findings as to Benny, Margery, and Johnnie because they are unsupported by substantial evidence.

## II.  The IHO's finding that Johnnie was not a resident of the HPL homesite is arbitrary and capricious.

To be eligible for relocation benefits, an applicant must show that (1) he was a legal resident of land partitioned to the tribe he was not a member of on December 22, 1974, and (2) he was a head of household at the time he moved away from the land partitioned to the other tribe. 25 C.F.R. §§ 700.147(a), (b), (e), 700.69(c). Determining residence "requires an examination of the person's intent to reside

combined with manifestations of that intent."[6] 49 Fed. Reg. 22277, 22277 (May 29, 1984). The IHO may consider several factors, including:

> Ownership of livestock, Ownership of improvements, Grazing Permits, Livestock sales receipts, Homesite leases, Public health records, Medical and Hospital records, including those of Medicinemen, Trading Post records, School records, Military records, Employment records, Mailing Address records, Banking records, Drivers license records, Voting records—tribal and county, Home ownership or rental off the disputed area, BIA Census Data, Information obtained by Certification Field Investigation, Social Security Administration records, Marital records, Court records, Records of Birth, Joint Use Area Roster, any other relevant data.

*Id*. at 22278. Here, the IHO found that Johnnie was a resident of the NPL or Seba Dalkai, rather than the HPL. In support of this finding, the IHO said that Johnnie's ex-wife's testimony that she and the children lived at Seba Dalkai was an "overpowering determinant" that Johnnie did not reside at the HPL. The IHO also cited to the BIA enumeration roster, which listed Johnnie as one of Fannie's family members at the NPL homesite. But the IHO did not take into

---

[6] Relying on principles of domicile, Johnnie argues that this court should use a burden-shifting framework to assess legal residence, but ONHIR regulations clearly state that "[t]he burden of proving residence and head of household status is on the applicant." 25 C.F.R. § 700.147(b).

account or otherwise address the enumerator's contrary testimony about the roster's reliability. Johnnie argues that the IHO's reliance on the BIA enumeration roster renders the IHO's residency finding arbitrary and capricious.[7] We agree.

The IHO relied almost exclusively on the BIA enumeration roster to conclude that Johnnie was a resident of the NPL or Seba Dalkai, rather than the HPL, because it listed Johnnie as a resident of the NPL homesite in January 1975. Indeed, ONHIR's counsel conceded at oral argument that the IHO relied on only two pieces of evidence for his residency finding: the BIA enumeration roster and Johnnie's ex-wife's testimony.[8] And only the BIA enumeration roster actually refers to the NPL homesite. But the IHO failed to consider or address other evidence that undermined the

---

[7] Johnnie also argues that the IHO's decision is arbitrary and capricious because the IHO failed to apply ONHIR's customary use area policy. Because we reverse on other grounds, we need not reach this second argument.

[8] The dissent argues that the IHO's residency determination should be affirmed because Johnnie and his family completed the sale of their livestock under the BIA livestock reduction program before December 22, 1974, and moved from the HPL homesite. Dissent at 18, 22, 24–27. Not so. Although Johnnie testified that the livestock reduction began in 1974 and he moved to the NPL homesite after the livestock reduction was completed, he never testified as to *when* the family sold all their livestock. But the record supports that it was after 1974. For example, Johnnie testified that he did not "move out" in 1974. And Benny specifically testified that the first livestock reduction took place in 1974, and the second livestock reduction may have taken place in 1975, and afterwards, "all the livestock were gone." In fact, the dissent acknowledges the conflicts in the testimony and the uncertainty regarding the "specific dates of the program and the family's move from HPL." Dissent at 25–27. Thus, contrary to the dissent's assertion, substantial evidence does not support the IHO's findings that Johnnie did not reside at the HPL homesite on December 22, 1974.

IHO's reliance on the roster. For example, the BIA enumerator testified that, where families owned multiple homesites, the roster would only list all family members at one homesite, regardless of how much time any family member spent at each. This testimony suggests that the BIA enumeration roster alone is not reliable because it reveals little about an applicant's residency at one homesite versus the other. It also explains why the roster may not have listed Johnnie at the HPL homesite, even though he claims the HPL as his residence. Ignoring all of this, the IHO summarily treated the enumeration roster as dispositive evidence of Johnnie's residence at the NPL. By neglecting to engage with the critical testimony in his decision, the IHO failed "to reasonably consider[] the relevant issues and reasonably explain[]" his decision. *Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The IHO's residency finding is therefore arbitrary and capricious.

## CONCLUSION

We conclude that the IHO's adverse credibility findings are not supported by substantial evidence and his residency finding is arbitrary and capricious. We thus reverse and remand the grant of summary judgment for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

BADE, Circuit Judge, dissenting:

The majority reverses the Office of Navajo and Hopi Indian Relocation's (ONHIR) decision denying relocation benefits to Johnnie Fuson under the Settlement Act, 25 U.S.C. §§ 640d to 640d-31.  The majority concludes that the Independent Hearing Officer's (IHO) adverse credibility findings are not supported by substantial evidence.[1]  And because it finds that the IHO improperly rejected hearing testimony from Johnnie, his brother Benny Fuson, and his cousin Margery Greyhair as lacking credibility, the majority concludes that the IHO's residency finding is arbitrary and capricious.  Maj. Op. 4, 15–16.

As an initial matter, I disagree with the majority's conclusion that the IHO's adverse credibility determination with respect to Johnnie is not supported by substantial evidence.  But more importantly, even if Johnnie's, Benny's, and Margery's testimony were deemed credible, that

---

[1] "The Administrative Procedure Act [(APA)] governs judicial review of agency decisions under the Settlement Act."  *Begay v. Off. of Navajo & Hopi Indian Relocation*, 305 F. Supp. 3d 1040, 1045 (D. Ariz. 2018).  Under the APA, courts may set aside an agency decision if it is not supported by substantial evidence.  5 U.S.C. § 706(2)(E).  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding."  *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 574 U.S. 293, 301 (2015)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Info. Providers' Coal. for Def. of the First Amend. v. FCC*, 928 F.2d 866, 870 (9th Cir. 1991) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *see also Zerezghi v. USCIS*, 955 F.3d 802, 814 (9th Cir. 2020) ("It is an extremely lenient standard that asks courts to consider only whether the administrative record contains sufficient evidence to support the agency's factual determinations." (internal quotation marks, alterations, and citation omitted)).

testimony does not undermine the IHO's residency determination such that it is not supported by substantial evidence.  The IHO, apart from the adverse credibility determinations, concluded that Johnnie was not eligible for relocation benefits because his family had sold their livestock as part of a Bureau of Indian Affairs (BIA) livestock reduction program and no longer resided on his grandmother Fannie Greyhair's homesite on the Hopi Partition Lands (HPL) by December 22, 1974.  This conclusion is supported by Johnnie's, Benny's, and Margery's testimony and the reasonable inferences drawn from that testimony.

And even if a contrary conclusion could also be drawn from their testimony, the IHO's residency determination would still be supported by substantial evidence because it is the agency's responsibility to "resolv[e] ambiguities," *Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 570 (9th Cir. 2018) (citation omitted), and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  Indeed, "[w]here evidence is susceptible of more than one rational interpretation, it is the [agency's] conclusion which must be upheld; and in reaching [its] findings, the [agency] is entitled to draw inferences logically flowing from the evidence." *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citations omitted).  I respectfully dissent.

## I.

Under the Settlement Act, Johnnie's eligibility for relocation benefits depends on the location of his legal residence on December 22, 1974.  *See* 25 C.F.R.

§ 700.147(a) (providing that to be eligible for benefits under the Settlement Act, "the head of household and/or immediate family must have been residents on December 22, 1974, of an area partitioned to the Tribe of which they were not members"). Therefore, as a member of the Navajo Nation, Johnnie was required to establish in the ONHIR proceedings that he resided at his family's homesite on the HPL on December 22, 1974. *See id.* § 700.147(b) ("The burden of proving residence . . . is on the applicant.").

The parties agree that before the enactment of the Settlement Act, Johnnie's grandmother, Fannie Greyhair, had two camps or homesites in the Joint Use Area (JUA). After the partition, one of these homesites was on the HPL, and the other was on the Navajo Partition Lands (NPL); ultimately, Johnnie's family retained only the homesite on the NPL. Thus, to determine Johnnie's eligibility for relocation benefits, the ONHIR was required to determine Johnnie's legal residence on December 22, 1974. And we must affirm that determination if it is supported by substantial evidence.

### A.

The IHO concluded that, on December 22, 1974, Johnnie resided at his family's NPL homesite, where he was listed as residing in the BIA's enumeration roster.[2] Alternatively, the IHO concluded that Johnnie resided at the Seba Dalkai

---

[2] The BIA performed a census of the JUA in 1974 and 1975 to document who lived there and to account for any improvements to the land. *Begay*, 305 F. Supp. 3d at 1045 n.4. This census is referred to as the enumeration. 25 C.F.R. § 161.1 ("Enumeration means the list of persons living on and identified improvements located within the Former [JUA] obtained through interviews conducted by BIA in 1974 and 1975.").

School with his wife and children in his wife's employer-provided housing.

The IHO found that Johnnie's testimony that he resided at the HPL homesite during this time was not credible because, among other reasons, he "downplay[ed]" his residence at Seba Dalkai.  The majority rejects this finding because it concludes that "Johnnie and his ex-wife [Ruth Begay] both testified that he did not consistently live at Seba Dalkai," Maj. Op. 11–12, but it ignores the inconsistencies between Johnnie's and Ruth's testimony on the matter.[3] Ruth testified that Johnnie lived with her at Seba Dalkai during their first year of marriage, which began in 1971, but that she often "didn't see him until late . . . evening after [she] got off work" because he was "always going home . . . when [she] went to work."  In contrast, Johnnie testified that, although he spent time at Seba Dalkai "off and on," the only place he resided in 1971 and 1972 was Lukai Springs (the HPL homesite).[4]  This inconsistency supports the IHO's finding that Johnnie "downplay[ed] his residence at Seba Dalkai." *See Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) ("Generally, 'questions of credibility and resolution of conflicts in the testimony are functions solely' for the agency." (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982))).

The IHO also found that Johnnie's testimony was not credible in part because he was listed as residing at the NPL home site in the BIA's enumeration roster.  The majority,

---

[3] The majority also criticizes the IHO's reliance on Ruth Begay's pregnancies as evidence of Johnnie's residence, Maj. Op. 12, and I agree that this portion of the IHO's reasoning is impermissibly speculative.

[4] Johnnie testified that he continued to live at the HPL homesite in 1973 and 1974.

however, concludes that the enumeration roster "cannot negate Johnnie's testimony about residing on the HPL" because the BIA enumerator testified that "being listed at one homesite on the enumeration roster was not necessarily indicative of a person's residence."  Maj. Op. 11.  But this reasoning is simply an argument that the IHO should have weighed the evidence differently.  *See Begay*, 305 F. Supp. 3d at 1049 ("[T]he BIA enumeration alone cannot establish residence, but it may be used as *prima facie* evidence of residency that Plaintiff then has the burden of disproving."); *see also* Commission Operations and Relocation Procedures; Eligibility, 49 Fed. Reg. 22277, 22278 (May 29, 1984) (listing the "Joint Use Area Roster" as relevant evidence for residency determination).  Here, the IHO drew reasonable inferences from the BIA enumeration roster, which, along with other evidence, provided substantial evidence to support the adverse credibility determination as to Johnnie and to support the residency determination.

And even considering the enumerator's testimony that a person may be listed at one site despite residing at multiple sites, Johnnie's description of his residency conflicted with the enumeration roster in another way—Johnnie was listed at the NPL homesite (and Fannie Greyhair, his grandmother, was listed at both the NPL and the HPL homesites), but he repeatedly testified that his family did not have *any* camps other than the camp at the HPL homesite and that he did not live anywhere other than the HPL homesite.  Although he acknowledged the existence of a "summer camp" on the NPL homesite after being shown a map and the enumeration roster, he continued to assert that there were no homes on the NPL homesite.  He later testified that the "summer camp" was not on the NPL but was instead in the JUA.  In sum, his testimony on the matter was, at best, ambiguous.  Given the

inconsistencies between Johnnie's testimony and other evidence, the IHO's adverse credibility determination as to Johnnie is supported by substantial evidence. *See Cal. Pac. Bank*, 885 F.3d at 570.

### B.

I also dissent because the IHO's decision included additional findings—specifically, that the family completed the sale of their livestock and moved to the NPL homesite before the passage of the Settlement Act—that provide substantial evidence supporting the determination that Johnnie did not reside at the HPL homesite on December 22, 1974.

These findings do not depend on the IHO's adverse credibility determinations.  Indeed, the IHO explicitly relied on Margery's and Benny's testimony to support his findings about the livestock reduction program.  *See* Appellant's Excerpts of R., Vol. 1, Dkt. 11-2, at 19–20 (Hr'g Officer's Oct. 15, 2015, Finding of Facts, Conclusions of Law, and Decision) ("[I]f Margery Greyhair and Benny Fuson are to be believed, by the time of the passage of the [Settlement] Act, the Lukai Spring home [HPL homesite] was vacated as Fannie Greyhair's livestock had been sold through the Livestock Reduction Program . . . ."); *id*. at 17 (finding that Margery "testified about the livestock reductions at which Fannie [Greyhair] sold livestock, and she testified about the family's move to the NPL camp following Reduction"); *id*. at 15 (finding that Fannie Greyhair "participated at least twice in the Livestock Reduction Program . . . and her flock and herd were significantly reduced or eliminated by the end of 1974").  And in rejecting Johnnie's residency claim based on a "traditional use area" theory, the IHO made additional findings about the livestock reduction program and the

timing of the family's move to the NPL homesite. *Id.* at 20 ("If there had been a traditional use area that encompassed both sides of the partition line, that traditional use area was abandoned by Fannie Greyhair when her livestock was sold and it did not exist as of the date of passage of the [Settlement] Act."). As detailed in the next sections, the IHO's findings about the family's livestock reduction and move to NPL are supported by Johnnie's, Benny's, and Margery's testimony. *See* Appellant's Excerpts of R., Vol. 3, Dkt. 11-4, at 380–446 (Aug. 21, 2015, Appeal Hr'g Tr.).

1.

As discussed in Section I.A, Johnnie's hearing testimony about where he lived was inconsistent and confusing. Even though the enumeration roster listed him as residing on the NPL and listed his grandmother as residing on both the HPL and the NPL, he testified that he grew up at his grandmother's HPL homesite, that his grandmother did not live at any other "locations," *id*. at 384–85, and that he lived nowhere other than the HPL homesite, *id*. at 386–87. He was shown a map of the area but again denied that his family had any homesites other than the homesite on the HPL. *Id*. at 388. After he was shown the enumeration roster, which showed that he was listed as residing on the NPL, he stated that his family had a "summer camp" on the NPL. *Id*. When asked again if his family had two homesites, one on the HPL and one on the NPL, he said "[n]o" and stated that there was no house or sweathouse at the NPL summer camp, "just a shed." *Id*. at 407. When asked again, he denied that his grandmother had a residence or a "place to live" on the NPL. *Id*. at 408. Making matters even more confusing, he later testified that the "summer camp" was on the JUA, not the NPL. *Id*. at 411. When asked if he still lived at the HPL homesite in 1975, Johnnie responded, "We sold some of the

livestock in '74, that's when the livestock reduction." *Id*. at 390. He later twice testified that the livestock reduction started in 1974. *Id*. at 408, 411. But Johnnie also testified that he got a job in Winslow in 1975, *id*. at 390, 408–09, and he would return to his grandmother's home on the weekends to take care of livestock, *id*. at 391. He testified that he has been living on the NPL since "they told us to move out, during the livestock reduction." *Id*. at 408. But he denied moving from the HPL in 1974. *Id*. And when asked again whether he remembered the year that his family moved from the HPL, he said, "No, can't answer." *Id*. at 411.

### 2.

Johnnie's brother, Benny, testified that their grandmother had two camps, one at Lukai Springs on the HPL, and one on the "Navajo side," which they used to graze their livestock. *Id*. at 419–20. There was a hogan, corral, and shed at the NPL camp. *Id*. at 424–25, 430. He testified that they stopped using the camp "on the Hopi side" after the livestock reduction. *Id*. at 421 (stating that they stopped using the HPL camp because they "had nothing, all the sheep, all the livestock were gone"); *id*. (stating that "[t]he Hopi's [sic] took them, or BIA, whatever"); *id*. (when asked if his family was forced to reduce their livestock, stating that "[i]t wasn't reducing, they just keep it all," "[w]e had nothing"). He testified that this livestock reduction occurred in 1974 or 1975. *Id*. He also said that he moved from the HPL in May 1975, after the livestock reduction. *Id*. at 432. He agreed that, after the livestock reduction, his family stopped using the HPL camp and started using the NPL camp more. *Id*. at 421.

3.

Johnnie's cousin, Margery, also testified that the family had two camps, one on the HPL and one on the NPL, and that there were "dwellings" at both camps. *Id*. at 435. She explained that the family would frequently move "back and forth between the two" camps depending on grazing conditions. *Id*. at 435, 443. She also testified that Johnnie was at these homesites in April 1974 when Margery's mother died in an accident, and that he made a living doing arts and crafts and silver work with Margery's mother.[5] *Id*. at 436–37. Margery testified that her family spent most of their time at the HPL camp until "the livestock reduction was forced on the people." *Id*. at 439–40. She initially stated that she did not remember the year of the livestock reduction program but then stated that there were two reductions; the first occurred before her mother's death in April 1974, "so it was before 1974, or '73," and the second was after her mother's death. *Id*. at 440. She testified that the family regularly used the HPL camp until the livestock reduction, and then "[i]t was a gradual move out to the NPL side." *Id*.

\*     \*     \*     \*

In sum, Johnnie, Benny, and Margery testified that their family moved from their HPL homesite "during" or "after" they were forced to sell their livestock through the livestock reduction program. *Id*. at 390, 408, 411, 421, 439–40. Although they all testified that the livestock reduction program either started or occurred in 1974, they all also expressed some uncertainty about the specific dates of the

---

[5] Margery testified that her mother was killed on April 5, 1974, when a generator exploded in the family hogan on the HPL homesite. Appeal Hr'g Tr., at 437, 441–42, 444–45.

program and the family's move from HPL.  *Id*. at 390, 408, 411, 421, 440.  Johnnie repeatedly testified that the livestock reduction program began in 1974.  *Id*. at 390, 408, 411. Benny said the livestock reduction program was in 1974 or 1975.  *Id*. at 421.  And Margery said there were two livestock reductions, one before her mother's death on April 5, 1974, "so . . . before 1974 or '73," and one at an unspecified date after her mother's death.  *Id*. at 440.  Johnnie denied that he moved from the HPL homesite in 1974, *id*. at 408, but then when asked if he remembered what year he moved, he said "[n]o, can't answer," *id*. at 411.  Benny said that he moved in May 1975, "[a]fter" the livestock reduction program.  *Id*. at 432.  Margery said that the family made a "gradual move out to the NPL side" after the livestock reduction, but she did not specify a date.  *Id*. at 440.

From this testimony, the IHO could reasonably conclude that Johnnie moved from the HPL homesite before December 22, 1974, and so substantial evidence supports the IHO's findings that "by the time of the passage of the [Settlement] Act, the Lukai Spring home [HPL homesite] was vacated as Fannie Greyhair's livestock had been sold through the Livestock Reduction Program."  Hr'g Officer's Decision, at 20; *see Info. Providers' Coal.*, 928 F.2d at 870 (explaining that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (quoting *Pierce*, 487 U.S. at 564–65)). And although there are conflicts in the testimony, "'questions of credibility and resolution of conflicts in the testimony are functions' solely for the agency." *Parra*, 481 F.3d at 750 (quoting *Sample*, 694 F.2d at 642).  Thus, under the "extremely lenient [substantial evidence] standard that asks courts to consider only whether the administrative record contains sufficient evidence to support the agency's

factual determinations," *Zerezghi*, 955 F.3d at 814 (internal quotation marks, alterations, and citation omitted), the agency's residency determination should be affirmed.

Because this testimony about the livestock reduction program is conflicting and ambiguous as to the specific dates the family sold all their livestock, the majority argues that the IHO's findings that the livestock reduction program and the family's move from the HPL homesite were completed before December 22, 1974 are not supported by substantial evidence. But when the evidence presents "the possibility of drawing two inconsistent conclusions," *Consolo*, 383 U.S. at 620, or "is susceptible of more than one rational interpretation," *Gallant*, 753 F.2d at 1453, "it is the [agency's] conclusion which must be upheld" because "in reaching [its] findings, the [agency] is entitled to draw inferences logically flowing from the evidence," *id*. Therefore, the IHO's findings that Johnnie and his family sold their livestock and moved from the HPL homesite before December 22, 1974 are supported by substantial evidence, and the agency's residency determination should be affirmed.

## II.

Because the evidence relevant to Johnnie's eligibility for relocation benefits is, at best, ambiguous and inconclusive, and thus we must defer to the agency's findings and conclusions, I respectfully dissent.